322-0427 National Rifle & Pistol Academy, LLC, Appellant Cross-Appellee v. EFN Brookshire Property, LLC, Appellant Cross-Appellant Yes, I am, Justice. And may it please the Court, my name is Patrick Boland, B-O-L-A-N-D, and I represent the Appellant Cross-Appellee National Rifle & Pistol Academy, LLC, who I may refer to from time to time as the buyer, given that this case revolves around the purchase and sale of a piece of property. Your Honor, we're here today for our appeal because the trial court erred in declaring that the party's agreement is unenforceable because of an ambiguity and a lack of certainty. As an initial matter, the standard of review that this court should apply is de novo. It owes no deference to the trial court. Whether or not a contract exists is a question of law, whether or not a contract is ambiguous is a question of law, and how a contract should be interpreted is also a question of law. Here, the trial court erred in determining that the contract is ambiguous. For a contract to be ambiguous, there needs to be two or more terms that are susceptible to two different meanings. You can read one provision in two different ways. There can either be a patent ambiguity, which is clear on its face, or a latent ambiguity, where an otherwise clear term becomes ambiguous when extrinsic evidence is introduced. In the case before us, there was no evidence presented to the trial court that showed an ambiguity within the contract documents. The rules of contract interpretation require that clear and unambiguous contract terms be enforced and that objective manifestations of the party's intent as documented in the written words of the agreement be enforced. This is a principle of the freedom of contract and that the parties can carve out their own bargain. Here, the court determined that the contract is unenforceable due to an ambiguity without ever defining the ambiguity. Likewise, the appellee introduced no evidence of any term in the contract that is actually ambiguous. There is no term that is susceptible to two different meanings. In the record... Mr. Brolin, may I ask a question? Yes. Where in the contract does it say specifically the property that is to be conveyed? Judge, the contract at paragraphs one and paragraph seven define the mechanism by which the property is to be defined. Paragraph one discusses the property, meaning the entire property located at 220 Brookshire Court in Naperville. And then it explains in paragraph seven that that property will be subdivided, creating the parcel to be conveyed. Now, if that process was not... What if the buyer didn't like the parceling, if you will, that the seller chose to submit to Naperville? What if you disagreed with what was given to Naperville? Are you saying that there would be no basis to complain about ambiguity in the contract if that happened? No, I'm not saying that, Judge. If my client disagreed with the parcel that the seller controlled in its submission to the city of Naperville, it had the opportunity under section seven of the contract, paragraph seven, to object to that which was presented to the city of Naperville. Now, importantly, the property to be sold is only based upon that which is approved by the city of Naperville. The city of Naperville can only approve what's presented to it. Right, which in this case, the seller controlled. So how this contract operates under paragraph seven of the contract is that the seller and the buyer were to cooperate on what the submissions to the city of Naperville would be, which is ultimately documented by the seller's chosen surveyor and engineer. If there was an objection by my client, then the property would not be submitted to the city of Naperville. Here there was no objection, and obviously the seller did not object either as it submitted the property that it caused to be described on the survey, which Naperville ultimately accepted and issued an ordinance allowing for the subdivision of the property, creating the parcel to be sold. So, in my hypothetical, let's assume that ultimately there's not an agreement as to what should be submitted to Naperville. If that had happened, what would your position be as to whether this contract would allow the buyer to enforce specific performance? If there's no meeting of the minds as to the property to be submitted to Naperville, then there's no contract that can be enforced. That is not the case here because there wasn't an agreement as to what was to be submitted as evidenced by the submission and Naperville's approval. In fact, at page R305 of the record, there's a stipulation offered by Mr. Polinsky that the parcel to be sold is to be created by the subdivision process. There was never any disagreement, whether it be through my client's witnesses or Mr. Polinsky's client's witnesses, that the parcel to be sold is documented through the subdivision process, which the seller controlled. The only evidence of any type of disagreement regarding the parcel to be sold is interjected by way of a separate drawing created prior to the contract, which was never part of the submissions controlled by the seller to the city of Naperville. That new term is not extrinsic evidence that clarifies a latent ambiguity. It's a new term. And on that basis, it should not be considered in determining what the party's rights are under the contract. You can't bring in extrinsic evidence to change the terms of the contract because ultimately that results in a court rewriting a party's agreement. Whereas in this case, what we have is the property being defined by the seller's conduct with the agreement of the buyer that the property to be conveyed is documented in the submissions to the city of Naperville. Now, turning to the trial court's ruling insofar as it declared the contract to be unenforceable for lack of certain terms. That declaration is an error because the contract is complete. The trial court noted that there are missing exhibits to this contract. However, none of those missing exhibits have any impact on the certain material terms that may be enforced. Or in the event that there are missing exhibits, it is the result of the sellers inaction or simply that those terms were mooted. Exhibit A to the contract is the definition of the property to then be subdivided through the subdivision process. We have as exhibit 45 in the trial court, E333 for this court's reference is a copy of the ordinance defining the parcel to be conveyed as the western lot on the survey approved by the city of Naperville after the seller submission. So that's complete. Exhibits B and F to the contract appear incomplete because they're not filled out, but in actuality, there's no purpose to those exhibits given that there was no lease entered into between the buyer and the seller. Their absence or their lack of detail is irrelevant to determine whether or not there is a complete and certain agreement. Likewise, exhibit C is complete, and there's been no dispute about that in the court below. And exhibit D, the access agreement, is also complete, and evidence introduced by witness Chuck Greco confirmed that. In fact, the agreement in paragraph 4 spells out specifically where the access point will be. Finally, the absence of the deed is the product of the seller's own decision not to take the plan of survey approved by the city of Naperville and cause it to be recorded, sign it itself on behalf of the seller, obtain the signatures of stormwater management, get a title commitment, and all those steps necessary to create the parcel to be in legal existence so that it can be conveyed. It was in error and contrary to the terms of the agreement and the facts presented in the trial court that this contract lacks any certainty. Can you address the judicial admission argument by the seller as it relates to the original complaint and whether a lease was a requirement of the contract? Yes, I can. This litigation was initiated after seller refused to record the property such that it could be sold to my client. Thereafter, an attorney for my client filed a complaint seeking to enforce the contract. That complaint was amended and it included some descriptions that state that there was a lack, there was a dispute as to the parcel to be conveyed, and ultimately that there weren't agreement on certain issues. However, the thrust of the complaint was to seek specific performance to enforce the contract that is written. Those judicial admissions are not judicial admissions whatsoever. A judicial admission only exists in a verified complaint and this was not a verified complaint. This is at most an evidentiary admission upon which there was no testimony and upon which there was actually a contrary explanation provided in court that there was an agreement as to all of these terms. The evidence suggests that as is put forth in the property recorded by the property passed through ordinance by the city of Naperville. And in addition to that, you have an amended complaint that states with more clarity that there was an agreement on these issues. The mere pleading of inartful pleading should not ultimately trump the terms of the contract, which state that there is an agreement that are clear, objective manifestations of the party's intent to contract at that time. And it's that intention that should control, not a pleading that is subsequently amended. So ultimately, I don't think I know, according to the law cited in our brief, that these statements and allegations contained in the complaints are not binding judicial admissions, but are merely evidentiary judicial admissions that should not trump the clear and unambiguous language of the contract, which is ultimately what the trial court needed to determine. Is there an enforceable contract? And that should be done looking at the four corners of the document without reference to the complaint. Mr. Bowling, I have a question about the license. I'm sorry, the leasehold. It seems like that was a critical element of the contract, and I'd like for you to address that. But before you go into it, I have another part to my question, because there was a requirement in the contract that the lease be executed prior to the expiration of the due diligence period. And at one point, that due diligence period was extended, which, if that extension applied to the lease, makes it seem like the lease was a critical element. So if you could explain how the lease fits into all of this. I will. First, Judge, the language of the contract shows that the lease is not a precondition to the sale of the property. We have a sophisticated seller who knew how to add a precondition to the contract or preconditional language, creating a contingency to the sale. None of that exists. What the agreement says with respect to the lease is that the parties will negotiate a lease in good faith before the end of the due diligence period, and that at closing, property will be delivered to the seller. There is no requirement whatsoever that the parties enter into the lease that makes the conveyance of the property subject to that lease actually being consummated. In fact, testimony at the trial court, and I'm pointing to the record at R-293 here, the seller testified the lease was not essential to it. It didn't necessarily even want to rent the space. That was Mr. Branstetter's testimony? That was Mr. Branstetter's testimony. And likewise, the reason Mr. Branstetter gave why he believed it was essential to my client, the buyer, was that we needed it for financing. There's evidence in the record through both my client's principal and my client's financer that there was funding irrespective of any lease requirements. There's simply no evidence looking at, number one, the lease, which should control that it is a requirement to the sale, and number two, the party's testimony that it was actually required. Thank you. You're welcome, Your Honor. With that said, the trial court erred in that respect in determining that the lease was integral, thereby rewriting a precondition or a contingency into the contract that these sophisticated parties did not bargain for. Your Honor, that concludes my argument on my appeal. I'm welcome to address the cross-appeal, but I see my time is up. Thank you, Mr. Boland. Mr. Polinsky? Yes, thank you, Justice Dade. I represent – my name is John Polinsky. I represent EFN Brookshire Property, LLC, which is the appellee cross-appellant. And this is a case about a commercial real estate transaction where, simply put, the buyer, the plaintiff, got in over his head and overestimated his ability to fund his proposed venture. We need to have a ready, able, and willing buyer, and we simply don't have that. How is that relevant to whether the contract is or is not ambiguous? It's almost like you're arguing anticipatory breach or something, but we're looking at the contract. How is a concern about whether at the closing the financing will be available relevant to whether or not the contract is ambiguous? Well, it's relevant in that it's my contention that this filing, which predated the scheduled closing date, was a pretext for avoiding the loss of the earnest money. It was apparent to me from the beginning that this was a situation where the purchaser found that he was unable to purchase, filed it claiming that a lease was essential and that we had not bargained in good faith. And Mr. Boland is correct. It's not a binding judicial admission. It's at best an evidentiary admission. But the parole evidence that was introduced throughout the course of the litigation and at trial shows that this contract was not going to be completed unless the buyer was able to get financing in a fashion which was commercially reasonable. And what his testimony was, Your Honor, was that he didn't like the financing that was available. He thought it was too rich for his blood and he wanted to supplement it with the commitment, which is in the exhibits. I think it was the Exhibit 32, which was not really a commitment. It was purported to be a letter of intent, which was expressly contingent upon approval of the lease in this case. So I think in whole, Judge Wheaton properly reached the conclusion that the fact that Paragraph 11 of the contract talked about bargaining in good faith for a lease, she could simply have reached the conclusion that this buyer was not in a position to be able to be willing, if able, to close and as a consequence that implicitly reaching agreement on a lease was a prerequisite. So from the very beginning of the litigation, that's been the problem that Mr. Boland's faced, not through his own making, but there's also all sorts of testimony from the witnesses that established that without this lease, this contract was not going to come across. The uncontroverted testimony of Mr. Branstadter, as Mr. Boland pointed out, was my client didn't need to enter into a lease. Mr. Branstadter's testimony was we wanted to retain the easternmost portion of it at all times. I was crystal clear in saying I needed to be able to retain parking along the north side of this building in order to commercially use the eastern portion of this parcel as an automobile dealership. And his testimony was that the only reason that that wasn't included in the plat of subdivision, which was submitted to the city of Naperville was because that would have caused the city of Naperville to require of an application for a variance in order to get away from the requirement that there would be set aside a certain number of parking spaces for the parcel, which was to be conveyed, which I think that Mr. Bevis' testimony was we weren't going to need all of those because of the nature of the proposed use. And so Mr. Branstadter's testimony was from the very beginning, I told them I need to keep this piece of property along the north where I can park the cars, which would be the inventory for the automobile dealership, which he envisioned being able to use that eastern portion for it. So it was clear from all the testimony that it went in by way of stipulated exhibits, uncontroverted and unobjected to parole evidence, that this was at best an agreement to make an agreement and all the moving parts just didn't mesh in order to get to the point where the transaction could be completed. And I go back to, do we have a ready, willing and able buyer? And the testimony from Mr. Bevis was I wasn't willing to take that money from Mr. Gladstone. I never asked him to move funds. I never asked him to fund it. He simply chose to file a lawsuit four days before the closing in order to preserve his opportunity to claim that it was a seller's breach rather than a buyer's inability to close. Thereby causing that earnest money to be forfeited pursuant to the First Amendment to the contract. So I would simply say whether the court, the trial court, reached the conclusion that there was an ambiguity and that implicit in the whole deal was the ability to reach agreement on this lease or simply could have reached the conclusion that the buyer was not in a position, the appellant was not in a position to actually close, court could have reached that conclusion as well. And this court can affirm Judge Wheaton's decision for any reason that appears in the record, irrespective of whether she got to that conclusion in the proper way. So are you saying, am I understanding you to suggest that based on Mr. Branstetter's testimony that the lease wasn't essential to the seller closing the deal, that ultimately you're not saying the lease was a condition precedent to the closing? I'm saying it was a condition precedent to the closing in that it was what would enable the buyer to be able to finance. But from the seller's perspective, the lease, looking at the four corners of the contract, was the lease a condition precedent to the closing? In other words, seller's there with the money, no problem, no lease, you're still going to go forward the lease according to, or to the contract and the sale according to Mr. Branstetter's testimony. I'll concede that the language of paragraph 11 of the agreement does not require an actual consummation of a lease. Absolutely. I have to concede that. And we've said all along that the real problem here was that we had a buyer who got in over his skis. So Justice Wheaton's, or sorry, Judge Wheaton's conclusion in that regard, your conceding was wrong. She should be affirmed for another reason, but it was not a condition precedent. It was not a requirement of the contract. Well, I will say that the parole evidence suggested that it was in fact a condition precedent, but that's how you get the introduction of an ambiguity based upon parole evidence. How do we get to that with the integration clause in mind? You simply acknowledge that the parole evidence went in without objection. And as a consequence, you look past the boilerplate that's in a standard commercial real estate transaction contract, and you realize that it's really a process that the parties were embarking upon. But don't we end up with Mr. Branstadter's testimony ultimately, the seller's representative, that this was not a condition that they anticipated ultimately to go forward with the sale, assuming that the buyer had the money? There's no doubt that Mr. Branstadter said we didn't need to rent back that portion of that building. That's correct. For our purposes. His testimony also was, however, we did need under any scenario to be able to preserve that parking along the north side of the building. And the only reason that wasn't included in the plan of subdivision, which was submitted to the city of Naperville, was because it would have caused a delay in approval of that flat because they would have to have sought a variance to allow less than the required number of parking spots per square footage of the building to be conveyed. Did you plead anticipatory breach at all? I believe we did plead that the filing was a pretext. That's correct. And that's the remainder of my argument. I think that this court can reach the conclusion that Judge Wheaton got it right all along, whether it's because the judge's finding that we needed, at least as a practical matter, made the buyer not willing or able to close. And certainly we have unrebutted testimony from Mr. Gladstone, or Gladson rather, that he could have made the money available, but his testimony also was he was never asked to make the money available. Had the buyer, had the plaintiff, had the appellant wanted to close, his testimony is, I had the money, I could have done it, but instead he filed lawsuit four days before the closing. When was the seller planning to file the plattive survey? Well, that's a ministerial act. It just requires signatures from members of the city council, I believe, of the city of Naperville, and all that needs is for it to be submitted. Typically that's handled by the title company, and the recording, of course, precedes the recording of the deed. But we all know that the deeds are recorded sometimes weeks after the closing occurs. And that's why there are personal undertakings at the closings. That's why there are all sorts of situations where sellers and buyers have ongoing obligations to satisfy the title company in order to get the title insurance policy effective. And I believe the testimony was that within two or three weeks before the scheduled closing, when the first draft of the lease was presented, there were meetings, and it was at those meetings where Mr. Branstadter testified that once I found out they were going to charge me some several hundred dollars, a couple of hundred, I think it was $170 is my recollection, per parking spot in this lease, which I had always maintained I needed, then at that point I said, that's not how it's going to work. It's not a commercially reasonable deal for me any longer. Well, the lease was not commercially reasonable. But again, Mr. Branstadter testified ultimately he didn't feel that the lease was necessary to go forward with the sale. Right. The lease wasn't commercially reasonable, but preservation of the right to park the inventory along the north side of the building was essential to the deal as far as Mr. Branstadter testified. And the proposal presented three weeks before the closing was, yeah, well, you can continue to have those parking spots, but you're going to have to pay us $170 per month. At which point, it's not relevant to the lease necessarily, but it's certainly relevant to whether or not the portion of the premises to the east that they were going to retain was going to be usable. Because Mr. Branstadter's testimony was, I needed the parking to operate an automobile dealership on the eastern portion, and they threw a wrinkle in it three weeks before the closing by saying, for those 100 spots, I want $170 per month per spot. At which point, it's essential to the sale of the western portion because it renders the eastern portion worth substantially less given that continued cash flow obligation in order to maintain the right to park along the north side. That's why his testimony, Mr. Branstadter's testimony was, I was looking for a perpetual easement along that parcel, not to rent the spots subject to some ongoing leasehold arrangement, whether for the portion of the building that would be retained or simply a leasehold to benefit the eastern portion that was always going to be retained. Well, if that was part of the agreement, wouldn't you anticipate it to be in the contract? Well, I mean, this isn't Ma Baker, and I mean, these are very sophisticated people represented by lawyers, right? Yeah, well, you're absolutely right that one would love to be able to rewrite the contracts that are presented to somebody as a litigant after the transaction falls apart. You're absolutely right. And Mr. Branstadter's testimony was, we did not talk about that in the sense that we had it included in the contract, but we have emails from June of 2018. And my recollection is I want to say June 7th or 14th, where Mr. Branstadter specifically asking Mr. Greco, what about the perpetual easement for parking? And Greco's response was, I've got Ms. West working on all of that. And come to October, we first see Ms. West presenting a lease that refers to that parking as something that's part of the leasehold and assigning a rental obligation for it. And I remember when Mr. Branstadter was saying, from the beginning, I told them I'm going to have to retain the right to park along the north side of that building in order for the piece I'm keeping to be commercially reasonably usable. So that's all I have on that. Yes, I'd love it for it to have been in the agreement more clearly. It's not. And that's why Judge Wheaton properly could have concluded that there was an ambiguity in terms of in terms of that lease or that parking or any 1 of those things. But I have, I have nothing beyond that to end. Thank you, Mr. Polinsky. Are there any other questions for him? I don't have it. Mr. Boland, you now have 5 minutes where you can rebut and also advance any argument that you want to make with regard to the cross appeal. Thank you, Justice. First, Mr. Polinsky's theories about the reason why this lawsuit was filed are absolutely irrelevant to this appeal, which deals solely with Judge Wheaton, the trial court's determination that the contract is enforceable. Second, Mr. Polinsky's arguments all espouse that a commercially sophisticated entity run by an individual whose entire career experience in commercial real estate, Mr. Branstadter, that his subjective intentions of what he wanted in the contract that do not actually appear in the contract should control. There is no basis in law where an individual's subjective desires trump a clear written contract. You heard Mr. Polinsky discuss Mr. Branstadter's desire that there be a perpetual easement or perhaps the desire that the lease be a condition precedent. There's no language in the contract that the lease is a condition precedent to the sale of property. There's no reference whatsoever in the contract that the parcel to be conveyed will be subject to a perpetual parking easement indefinitely for the benefit of the seller. In fact, page R300 of the record, Mr. Branstadter testified that the perpetual parking easement, according to him, was the most essential part of the contract, but it was not in the contract. To let the perpetual parking easement desire wish trump anything the contract says is an error. And I believe that was an error by the trial court insofar as that's the ambiguity or the portion of enforceability that it identified. In fact, regarding that perpetual parking easement, please recall that the contract required the seller to define the parcel to be conveyed through its engagement of an engineer, cooperation with the buyer, and ultimately numerous submittals to the City of Naperville. Exhibits 38 through 41 show multiple submittals of plats of survey to the City of Naperville, and exhibit 45 shows the submittal that's actually passed an ordinance. Not a single one of those contains a perpetual parking easement. Had seller ever actually wanted a perpetual parking easement, it just needed to tell its surveyor to put it on the plat of survey that it would have submitted, at which point the buyer could have objected. That never occurred. Instead, there was an ad hoc claim by Mr. Branstadter that after the property was defined through the survey process that the seller controlled, the agreement was actually something else. But that contradicts the four corners of the document and the plat of survey that it submitted to the City of Naperville. The explanation that Mr. Polinsky provides for seller's failure to include the most essential part of the contract in either the contract or the plat of survey is essentially that the seller was trying to dupe the City of Naperville in that it would have access to more parking spaces by not fully informing Naperville as to who would use those parking spaces. Well, that's inappropriate on numerous levels, but I think it mostly supports the idea that it wasn't a term in the contract. It was never agreed to because it does not appear in any four corners of the contract. No one agreed to that term, and it can't be interjected after the fact. Now, Mr. Polinsky also discussed parole evidence admitted as evidence by agreement. And that's true. Every exhibit that went into the record in this case was admitted by agreement. But simply because parole evidence exists does not mean it should affect the interpretation of a contract. Rules of contract interpretation require giving effect to clear, unambiguous terms. And please note that not once in Mr. Polinsky's argument did he identify any ambiguity in the contract, nor did the trial court. So you can have all of the parole evidence you want. In this case, 50 exhibits or so. None of it matters if there is not a threshold ambiguity that that parole evidence needs to be considered in order to explain the ambiguity. There is no ambiguity in this case. With all that said, with respect to finally Mr. Polinsky's theory that the trial court could have weighed issues of credibility and issues of fact as to who breached first. Please keep in mind, there's never been a property that the seller could convey to my client because it refused to get stormwater management signings. It refused to sign the deed itself. And if I may, my time is up. If I may please finish my thought. There's never been a property that can be conveyed because the seller was notified it would take weeks to obtain all proper signatures. It was never received. So my client was in the untenable position to either file a lawsuit to obtain specific performance or pay $200,000 in non-refundable money only to be told later on, we're not going to sell you this property unless it has the perpetual easement that's not in the contract. For all those reasons, I ask that you reverse the trial court on the issue of enforceability and remand the case for trial on the issue of breach and damages. Thank you. Thank you, Mr. Boland. Mr. Polinsky, do you have any discussion with regard to the cross appeal? Yes. And I would say that I respectfully disagree with Mr. Boland to say that parole evidence, which was admitted by agreement and by direct testimony, is not something that the court can consider to determine that what otherwise appears to be a language that is unambiguous is, in fact, ambiguous. And as it relates to my appeal, it kind of goes back to the question Justice Brennan asked me at the beginning, which is to say, it's obvious to me that four days before the closing with the only document that even remotely resembles a commitment for financing, but which expressly says it wasn't a commitment for financing, that the buyer was in a position at best to raise 60 percent of the purchase price with conditions. And those conditions included the existence of and approval of a lease. They included the fact that that lender, T2, and I think it's Exhibit 32, would be in a first position. They included a condition that said that that lender would not allow any other leverage, that is to say, any other encumbrance on the property. And in which case that makes Mr. Gladson's funds not really available because Mr. Gladson's uncontroverted testimony was, if I had done it, I would have wanted a mortgage and we would have to have documented it. But by the way, Mr. Bevis never asked me for the funds. And Mr. Bevis candidly admitted I didn't want Mr. Gladson's money at a 20 percent return on investment rate of interest. That was too steep for me. And so the court could have, and I think respectfully should have, reached the conclusion that this filing was, in fact, a pretext, and that we did not have a ready, able, and willing buyer with funds sufficient to take out the entire purchase price. Did you have a property that you were able to sell to him at that point? I would respectfully submit that once that legal description was approved by the city of Naperville, the actual act of recording was a ministerial act which would have followed the closing. The deed could have been conveyed, could have been delivered, and the title company, as a matter of course, would simply have recorded one document, the plat, prior to recording the second document, the deed. And that happens in commercial real estate transactions. Heck, that happens in residential real estate transactions all the time where the title company takes responsibility for the proper order of the recording so that its title insurance commitment can be effectuated. And so I would suggest that we could have signed a deed with exactly the legal description, which was on the ordinance which was approved by the city of Naperville, and the title company would have taken care of the ministerial act of obtaining the signatures and getting it recorded in proper fashion. And that's all I have to add there. Thank you. I'm sorry, are there any questions for Mr. Polensky? None for me. We thank both of you for your arguments this morning. We'll take the matter under advisement and we'll issue a written decision as quickly as possible.